**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ALLYSA FITCH, JAKIRA POINDEXTER, TASHIBA HARRIS, TYSHAUN MOULTRIE, RYAN DICKERSON, and ADE ANIMASHAUN, individually and on behalf of those similarly situated,**<br><br>***Plaintiffs*,**<br><br>**v.**<br><br>**CENERGY INTERNATIONAL SERVICES, INC.,**<br><br>***Defendant.*** | **CIVIL ACTION**<br>**NO. 2:25-cv-02318 -DJP-JVM**<br><br>**JUDGE DARREL J. PAPILLION**<br>**SECTION "P"**<br><br>**MAGISTRATE JUDGE JANIS VAN MEERVELD**<br>**DIVISION 1** |

**DEFENDANT CENERGY INTERNAL SERVICES, INC.'S REPLY IN SUPPORT OF ITS RENEWED MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

Plaintiffs' opposition rests on the sole argument that the Dispute Resolution Agreements ("DRAs") were somehow "superseded" by Employee Handbooks. In opposing arbitration, Plaintiffs do not dispute that the DRAs were validly formed. Instead, they simultaneously claim that (1) those DRAs were somehow novated by the Handbooks which they say constitute new, later-formed agreements, but also (2) that the Handbooks are not agreements at all and so there is no basis to compel arbitration under them. Plaintiffs cannot have it both ways: if the Handbooks are not contracts, then they cannot supersede the DRAs. If they are, then the arbitration provisions in them would still compel arbitration. Plaintiffs' positions are irreconcilable.

More bizarrely, Plaintiffs' own chart shows that most Plaintiffs signed their Handbook acknowledgements *before* the DRAs—meaning that even if one "agreement" somehow superseded the other (which Cenergy disputes), the DRAs are the later, enforceable agreements.

Beyond the inconsistency in Plaintiffs' argument, the reality and law is that the DRAs are validly formed and enforceable. They were not novated or superseded by the Handbooks. The DRAs should be enforced, and each Plaintiff's claims should be compelled to arbitration.

## I. ARGUMENT

### A. The Employee Handbooks do not supersede the DRAs.

Cenergy maintains that nothing in the Handbooks superseded the DRAs. What Plaintiffs call a "superseding" agreement is the doctrine of novation. But the standard for showing novation is high, and requires the express *agreement* of the parties. "Novation takes place when, by agreement of the parties, a new performance is substituted for that previously owed, or a new cause is substituted for that of the original obligation" or "when the parties expressly declare their intention to novate an obligation." LA. CIV. CODE art. 1881. "Novation may not be presumed," LA. CIV. CODE art. 1880. *Bruening v. Onemain Fin. Group, LLC*, No. CV 25-2569, 2026 WL 1429003, at *6 (E.D. La. May 21, 2026). Plaintiffs' novation argument fails the standard and mischaracterizes the Handbooks.

***First***, "Courts in Louisiana have overwhelmingly rejected employee handbooks and manuals as the source of contractual obligations." *Carter v. Quintairos, Prieto, Wood & Boyer, P.A.*, No. CV 25-2273, 2026 WL 1077436, at *2 (E.D. La. Apr. 21, 2026). While a handbook may update corporate policies, practices, and procedures, it "does not have the effect of revoking prior contracts." *Corley v. Se. Metals Mfg. Co., Inc.*, No. CIV.A. 10-786, 2011 WL 3665015, at *6 (W.D. La. Aug. 19, 2011). Because a handbook does not confer contractual rights, it lacks the legal force to extinguish a separately signed arbitration agreement. This is true even when the handbook contains language stating it takes "precedence over, supersedes [sic] and revokes any previous memo bulletin, policy or procedure." *Id.*

***Second***, and consistent with the law's view of Handbooks as non-contractual statements of policy, the Handbooks and Acknowledgment Forms here disclaim any contractual status. R. Doc. 32-12 at 3 and 5, R. Doc. 32-13 at 3 and 5, and R. Doc 32-14 at 5 and 32. *See* Walker at 985 (handbook does not form a binding agreement, particularly where the accompanying acknowledgment form expressly states the handbook is not a contract).

The 2017 and 2019 Handbook Acknowledgment Forms state that "this Handbook is neither a contract of employment nor a legal document" and clarify the Handbook "may supersede, modify, or eliminate existing policies" and "policies, practices, and procedures" in previous versions of the Handbook. R. Doc. 32-12 at 3 and R. Doc. 32-13 at 3. The Acknowledgment Form for the 2023 Handbook similarly states, "the Handbook is not a contract of employment," and the Handbook "contains policies, practices, and procedures" that may change with subsequent "revisions and/or additions to the Handbook." R. Doc. 32-14 at 33.

***Third,*** the Handbooks are clear that they only supersede prior "policies" [R. Doc. 32-12 at 5, R. Doc. 32-13 at 5, and R. Doc. 32-14 at 6], meaning that a new Handbook only supersedes a prior version of the Handbook or policy statement. *Id.* The DRAs, on the other hand, are clear that they supersede any prior "dispute resolution agreement." R. Doc. 32-3. at 3, R. Doc. 32-4 at 3, R. Doc. 32-5 at 3, R. Doc. 32-6 at 3, R. Doc. 32-7 at 3, R. Doc. 32-8 at 3, and R. Doc. 32-9 at 3. In other words, a Handbook update only replaced prior Handbooks. The Handbooks do not "supersede" the DRAs, which are independent agreements.

***Fourth,*** five of the Plaintiffs here signed the DRAs *after* they signed the Handbook Acknowledgements. As Plaintiffs' own chart shows [R. Doc. 36 at 3], Plaintiffs Animashaun, Poindexter, Dickerson, and Moultrie signed the DRAs *after* the relevant Handbook acknowledgments, and Harris apparently did not sign an acknowledgement at all. R. Doc. 36 at

3. For all five of these Plaintiffs, the DRAs were the most current, counter-executed forms. It makes no sense to say that the DRAs were superseded by a Handbook that was signed and acknowledged *before* the DRAs were signed.

**B. Neither *Willis* Nor *Coinbase* Alters That Result.**

Plaintiffs argue that the Handbooks supersede the DRAs, and thus a Court, not an arbitrator, must decide the issue of arbitrability. R. Doc. 30 at 3. But this argument fails: the Handbooks are not superseding agreements because the Handbooks are not agreements at all. In Plaintiffs' own words, "Louisiana courts have overwhelmingly rejected employee handbooks as the source of contractual obligations, including obligations to arbitrate, because such manuals generally constitute unilateral expressions of company policy," and "that is particularly true where, as here, the handbook expressly disclaims contractual force." R. Doc. 36 at 9 (citations omitted).

Because there is only one arbitration agreement (the DRAs), neither *Willis* nor *Coinbase* are applicable to the issue of who decides arbitrability. Even if the DRAs were "superseded" (and they were not), there would still be only one arbitration agreement (in whatever document superseded the DRAs). Plaintiffs' arguments based on those cases are specific to instances where there is more than one agreement to agreement to arbitrate *and* those agreements are inconsistent. But Plaintiffs do not argue there are two live contracts or agreements with arbitration provisions: they argue there was one that was later replaced by another.

Even if there were two, though, Plaintiffs' cases compel arbitration under the applicable law, which is the lesson of *Matter of Willis*. 944 F.3d 577 (5th Cir. 2019). Plaintiffs try to distinguish *Matter of Willis* by arguing that (1) the arbitration agreements in *Willis* were contemporaneous rather than successive, and (2) the arbitration clauses differed only as to "procedural minutiae" such as arbitrator selection, location, and fees. R. Doc. 36 at 9. 944 F.3d

577 (5th Cir. 2019). Here, Plaintiffs try to distinguish between the DRA and the Employee Handbooks by arguing about differences between which claims are arbitrable, which rules govern, and who bears what costs [R. Doc. 30 at 8]. But the distinctions fail: Plaintiffs' FLSA claims here are covered by both the DRA and the policy language in the Handbook. Each of the Plaintiffs' DRAs state:

> 1. Any claim, dispute or controversy ("Claim") by either You or the Company against the other arising from or relating in any way to this Agreement or Your employment with the Company shall, at the demand of any party, be resolved by an arbitration proceeding before the American Arbitration Association pursuant to the code of procedures of the American Arbitration Association in effect at the time the Claim is filed.

R. Doc. 32-3 at 2, R. Doc. 32-4 at 2, R. Doc. 32-5 at 2, R. Doc. 32-6 at 2, R. Doc. 32-6 at 2, and R. Doc. 32-7 at 2. The 2017 and 2019 versions of the Handbook state:

> **Any claim, controversy, or other dispute relating to your employment with or separation from the Company, or following separation from the Company shall be resolved by arbitration, in lieu of jury trial or any other legal proceeding, pursuant to the Federal Arbitration Act (Title 9, United States Code), and in accordance with this dispute resolution program.**

R. Doc. 32-12 at 11 and R. Doc. 32-13 at 11. The 2023 version of the Handbook states:

> If the claim, controversy, or other dispute relating to an employee's employment with or separation from Cenergy or any other claim, controversy, or other dispute following separation from Cenergy is not resolved by mediation (including any claims, controversies, or other disputes that arise in connection with the performance or breach of an agreement reached in mediation), the claim, controversy, or other dispute shall be resolved by arbitration, if allowed by applicable state law, in lieu of jury trial or any other legal proceeding, pursuant to the Federal Arbitration Act and governed by the substantive laws of the State of Texas or the state/province required by applicable law.

R. Doc. 32-14 at 14. Under the DRAs and every Handbook version, employment claims (like FLSA claims) are bound for arbitration. There is thus no distinction between them despite Plaintiffs trying to manufacture one.

Otherwise, who bears costs and which AAA rules govern are the same kind of procedural detail the Fifth Circuit addressed in *Willis* because they concern the *mechanics* of arbitration, not whether the parties agreed to arbitrate in the first place. *Willis* at 582 ("[T]he conflicting terms here aren't like the essential terms of price and rent. Instead, they concern such innocuities as the number of arbitrators, location, and fee shifting.").

In circumstances like this, the Fifth Circuit's instruction is clear: courts must not "shut [their] eyes to an agreement that demonstrates a baseline intent to arbitrate just because it contains inconsistent terms about procedural minutiae." *Id.* at 582 (citation omitted). That principle applies with equal force here.

Nor does Plaintiffs' contemporaneous-versus-successive timing distinction change the argument. *Willis* did not limit its holding to contemporaneous agreements; rather, the court's reasoning turned on whether both instruments reflected a shared intent to arbitrate *regardless* of their timing. *Id*. ("Though the agreements differ over procedural details, they speak with one voice about *whether to arbitrate*. We thus find good company in Justice Gorsuch: We will not shut our eyes to an agreement that demonstrates a baseline intent to arbitrate just because it contains inconsistent terms about procedural minutiae.").

Here, both the DRAs and the Employee Handbooks contemplate arbitration as the mechanism for resolving employment disputes. If anything, the successive nature of the Handbooks reinforces the parties' continued intent to arbitrate, rather than undermining it. Even if the Handbook is seen as a superseding agreement as Plaintiffs argue (and again, it is not), the

instruments "speak with one voice about whether to arbitrate," *Id.*, even if they diverge on procedural details.

Plaintiffs' reliance on *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024) suffers the same fate. Plaintiffs contend *Coinbase* stands for the broad proposition that whenever successive arbitration agreements bear on the same dispute, the court (rather than an arbitrator), must decide which agreement governs. That is not what *Coinbase* holds. The Supreme Court drew a clear distinction between two scenarios: where the parties have agreed to *one* contract containing an arbitration clause with a delegation provision, courts must send all arbitrability disputes to arbitration, absent a successful challenge to that delegation provision; but where the parties have agreed to *two contracts* with "one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts" then the court must decide which contract governs. *Id.* at 152, 144 S. Ct. at 1194.

Critically, *Coinbase* requires two *contracts* with conflicting arbitrability provisions before the court assumes the threshold gatekeeping role. Here, there is only one dispute agreement (the DRA). But even if the Handbooks *are* treated as agreements, both the Handbook and DRA delegate arbitrability issues to the arbitrator (as described below). The inconsistency between agreements described in *Coinbase* is not present here, as any differences are mere procedural minutiae like that in *Willis* that still require arbitration. Either way, *Coinbase* and *Willis* point in the same direction: toward arbitration.

**C. The DRAs delegate questions of arbitrability to the arbitrator.**

Plaintiffs do not challenge the delegation provision in the DRAs. Instead, they attempt an end-run around it by observing that the AAA maintains different industry- and context-specific sets of rules and that the DRAs reference a generic "code of procedures of the [AAA]" rather than

naming a particular rule set. R. Doc. 36 at 11. From this, Plaintiffs argue that the DRAs fail to delegate arbitrability because the parties never identified which AAA rules govern. This argument fails because Plaintiffs rely on a distinction without a difference. There is no dispute that the DRAs send the matters to AAA arbitration, which is enough. *See Bruening*, 2026 WL 1429003, at *7 (E.D. La. May 21, 2026) (language that any arbitration would "be conducted under the rules and procedures of the American Arbitration Association ('AAA') in effect at the time the arbitration is started" was sufficient, without reference to a specific rule set).

In any event, the AAA's various rulesets all contain delegation language vesting the arbitrator with the authority to determine threshold questions of arbitrability, including challenges to the existence, scope, and validity of the arbitration agreement. All of the Commercial, Employment, and Labor arbitration rules contain such a provision.[1] Plaintiffs have not and cannot identify a single AAA rule set that withholds that delegation authority and which they think would apply. The fact remains that the DRAs incorporate the "code of procedures of the [AAA] in effect at the time the Claim is filed" which is unmistakable evidence of the parties' intent to delegate.

It does not matter which of the AAA's rule sets the DRAs incorporate because each one leads to the same result: the arbitrator decides arbitrability. *Fla. Gas Transmission Co., LLC v. Texas Brine Co., LLC*, 267 So. 3d 633, 637 (La. App. 1st Cir. 2018), writ denied, 275 So. 3d 876 (La. 2019) ("Rule R-7 of the AAA Rules provides the arbitrator shall have the power to rule on his or her own jurisdiction, including the validity of the arbitration agreement.").

[1] *See, e.g.,* American Arbitration Association, *Commercial Arbitration Rules and Mediation Procedures,* https://www.adr.org/media/ueonklrv/2026_commercial-arbitration-rules-mediation-procedures.pdf (last accessed Sept. 9, 2026). A copy is attached as Exhibit A. *See* also American Arbitration Association, *Employment/Workplace Arbitration Rules and Mediation Procedures,* https://www.adr.org/media/aktbpg2y/2026_employment-arbitration-rules-and-mediation-procedures.pdf (last accessed Sept 9, 2026). A copy is attached as Exhibit B. *See* also American Arbitration Association, *Labor Arbitration Rules,* https://www.adr.org/media/wgvdxucs/2026_laborrules_web.pdf (last accessed Sept. 9, 2026). A copy is attached as Exhibit C.

Plaintiffs' subordination argument fares no better. Even assuming that the Handbooks applied as contractual arbitration agreements (which again, is disputed), Plaintiffs argue that the Handbooks' Dispute Resolution Program places "applicable AAA rules" second in priority behind Cenergy's procedures. R. Doc. 36 at 13. But Plaintiffs identify no conflict between AAA rules and Cenergy's rules as to arbitrability. *See* R. Doc. 32-12 at 10, R. Doc. 32-13 at 11, and R. Doc. 32-14 at 14. Cenergy's policies address the mechanics of how disputes are processed internally before reaching arbitration. *Id.* The delegation question of *who* decides whether a dispute is arbitrable is not contradicted by Cenergy's internal procedures, and so the incorporation and reference to the AAA rules remains sufficient to delegate questions of arbitrability to the arbitrator. There is no conflict in the priority hierarchy on this point, and Plaintiffs identify none. Because both the DRAs and the Handbooks contain delegation provisions, this issue too must go to the arbitrator.

Finally, Plaintiffs' reliance on *Hill v. Jackson Offshore Holdings, L.L.C.* is similarly misplaced. 175 F.4th 324 (5th Cir. 2026). The relevant part of *Hill* says only that the Court must decide challenges to the delegation provision itself. Here, Plaintiffs are not challenging a delegation provision, they are challenging the DRA in its entirety (by claiming it was "superseded" or novated). Nothing in *Hill* holds that a delegation provision is unenforceable merely because a party challenges it. Rather, it holds that when an arbitration agreement contains a delegation provision (as here), then issues of arbitrability are decided by the arbitrator "absent a challenge to the delegation clause itself," and that a challenge to the agreement as a whole (as Plaintiffs raise here) is insufficient. *Hill* at 335.

Despite suggesting otherwise, Plaintiffs' challenge in this case is to the arbitration agreements (the DRAs) as a whole (by claiming they were superseded), rather than just the delegation provision. R. Doc. 36 at 7 and 13. Fairly read, *Hill* does not change the analysis.

**D. Ms. Harris's DRA is enforceable.**

Plaintiffs finally argue that Ms. Harris's DRA is not enforceable because it was with Cenergy Partners, rather than Cenergy International Inc. This argument fails because Harris ignores the evidence attached in support of its motion to compel arbitration. Mr. Picou's Declaration explains that after Cenergy International Services, L.L.C. was incorporated (and became Cenergy International Services Inc.), that new entity acquired and ratified all of Cenergy Partners, LLC's assets and contracts, specifically including Ms. Harris's DRA. R. Doc. 32-2 at ¶¶ 12-13.

Plaintiffs tellingly offer no counter authority to contradict this evidence. The evidence attached to Cenergy's motion to compel shows that Harris was employed by a Cenergy entity, the DRA was valid between her and her employer, and that the current Defendant Cenergy entity (Cenergy International Services, Inc.) acquired and ratified that DRA. *ERG Enters., LLC v. Green Coast Enters., LLC*, 299 So. 3d 1194, 1199 (La. App. 4 Cir. 5/13/20), *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420,427 (La. App. 2 Cir. 4/10/19) (non-signatories may invoke an arbitration agreement through theories including assumption, agency).

**PRAYER**

For the reasons stated in this Reply, and those stated in Defendant Cenergy International Services, Inc.'s moving papers and the memorandum in support, Cenergy asks the Court to grant its motion to compel arbitration and stay this case, to be reopened, if necessary, after arbitration is completed.

Respectfully submitted,

Andrew J. Brien

La. Bar No. 37051
andrew.brien@mhllp.com
Robert Paul Debelak III*
Texas Bar No. 24078410
bobby.debelak@mhllp.com
William X. King*
Texas Bar No. 24072496
william.king@mhllp.com
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850

***Counsel for Defendant Cenergy International Services, Inc.***

*** Pro Hac Vice***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure via email and/or filing through the Court's ECF System on September 8, 2026.

Caroline Gabriel
William Most
Most & Associates
201 St. Charles Ave., Ste. 2500, # 9685
New Orleans, LA 70170
Tel.: 985-441-9355
caroline.gabriel.ma@gmail.com
williammost@gmail.com

Kenneth C. Bordes
Abigail Floresca
Law Office of Kenneth C. Bordes
3914 Canal St.
New Orleans, Louisiana 70119
Tel.: 504-588-2700
Fax: 504-708-1717
kcb@kennethbordes.com
abigail@kennethbordes.com
**ATTORNEYS FOR PLAINTIFFS**

Robert P. Debelak III